**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| TERRY BATTLE, | : | |
| | : | Civil Action No. 13-2024 (JLL) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Respondent. | : | |
| | : | |

**LINARES**, District Judge:

Presently before the Court is Petitioner Terry Battle's motion to vacate, set aside, or correct his sentence brought pursuant to 28 U.S.C. § 2255. (ECF No. 1). Judge Hochberg denied Petitioner's § 2255 motion on or about March 26, 2014. (ECF Nos. 10-11). Petitioner thereafter filed a motion pursuant to Federal Rules of Civil Procedure 59(e) and 60(b) to reopen this matter and for relief from Judge Hochberg's order (ECF Nos. 13, 15, 18), which this Court granted in part and denied in part on June 30, 2015. (ECF Nos. 23-24). This Court held an evidentiary hearing on Petitioner's sole remaining § 2255 claim on December 8, 2015. (ECF No. 37). Following the hearing, both the Government and Petitioner filed briefs in this matter on January 13, 2016. (ECF Nos. 38-39). For the following reasons, this Court will deny Petitioner's sole remaining claim for relief in his § 2255 motion, and will deny Petitioner a certificate of appealability.

## I. BACKGROUND

As the factual background of Petitioner's case has been laid out both in this Court's order

denying Petitioner's initial § 2255 petition and in this Court's order granting in part Petitioner's

Rule 59(e) motion (ECF Nos. 10, 23), this Court will not summarize in full the factual and

procedural background of this case, but will instead briefly discuss the testimony elicited in the

evidentiary hearing held in this matter on December 8, 2015.  (ECF No. 37).  Two witnesses

testified during the hearing, Petitioner and his trial counsel, Zilka Saunders.  This Court will

discuss the testimony of each in turn.

　　During his testimony, Petitioner first recounted his version of the events which followed

from his arrest, including his assertion that Government agents isolated him and threatened to bring

charges against his wife, who was on vacation at the time of his arrest, to ensure his cooperation

and force him to give a statement.  (Document 1 attached to ECF No. 38 at 4-6).  Petitioner

further testified that, in order to protect his wife and to avoid being tried as the leader of the drug

trafficking organization with which he worked, Petitioner agreed to help the Government perform

a sting operation which resulted in the arrest of one of Petitioner's co-conspirators in the drug

organization.  (*Id.* at 6-7).  Petitioner thereafter stated that he pled not guilty at his arraignment

and was taken to jail, where he was met by counsel, despite not having called or hired her in

advance.  (*Id.*).

　　Petitioner testified at length that the reason counsel became involved so proactively, and

the reason she kept in constant contact with him throughout his incarceration, trial, and appeal was

because Petitioner and Ms. Saunders were engaged in an at least semi-romantic relationship prior

to and during Ms. Saunders' representation of Petitioner.  (*Id.* at 7-9).  Petitioner testified that he

had met Ms. Saunders after being introduced to her at a club by a friend of his who worked in the

same law office as Ms. Saunders.  (*Id.* at 7-8).  Petitioner claims the two became friendly, and

ultimately met up twice the following day, resulting in the two of them starting a relationship which included several meals and an evening of dancing. (*Id.* at 8). Essentially, Petitioner claimed that counsel came to see him at jail without being called because she had been looking for him after he stopped contacting her following his arrest. (*Id.* at 8-9).

Petitioner then asserted that, following that first meeting, Ms. Saunders spoke with her employer, Paul Bergrin, and Bergrin offered to have his office represent Petitioner for an agreed upon sum. (*Id.* at 11). Petitioner also stated that Saunders told him that Bergrin thought Petitioner's was a winnable case because his treatment following his arrest was "a clear violation of [Petitioner's] constitutional rights." (*Id.*). Petitioner said that his decision to hire Saunders as his attorney stemmed from her assertion that he could "beat this charge." (*Id.* at 13). Specifically, Petitioner claimed that counsel gave him the following advice:

> from the beginning, she said that we [were] going to have to file a motion . . . to suppress the evidence, and that the motion was going to be based on the violation of my constitutional rights, the fact that they held me without making [any] phone calls. The fact that they had ripped up [a form asserting that Petitioner didn't want to speak with agents.] [W]hen [Petitioner] told [Saunders] that they had ripped up that first form, she said that was a violation also, that they had no business . . . ripping up the first form that I signed, and that everything else after that becomes null and void because they violated . . . two of my constitutional [rights].
>
> . . . .
>
> She said the only thing I had to do [to get the statements suppressed] was recant my statement . . . and tell them I fabricated the story, and that it wouldn't be good. It wouldn't hold up.

(*Id.* at 13). Petitioner further asserted that counsel told him that this motion would effectively render all of his statements and his cooperation with the Government in setting up his co-conspirator inadmissible against him. (*Id.*).

3

As for the plea agreement that was offered to Petitioner, Petitioner asserts that counsel only discussed it with him once in a cursory manner:

> [Ms. Saunders] mentioned one thing about a plea one time to me, and I don't remember whether it was . . . sometime in September [after his arrest].   She said the Government sent over some ridiculous outrageous plea, some open-ended plea that I am not even going to entertain.

> I was like, some ridiculous open-ended plea, because I don't know what an open-ended plea is – I didn't know what an open-ended plea was.

> I was like, what are you talking about?

> She was like, do you want to go home or do you want to go to jail?

> And she laughed.

> And I said, I want to go home.

> And then she said, all right, then don't worry about this plea.

> . . . .

> The way [Saunders explained things to Petitioner, his motion to suppress] was guaranteed.

> See, the way she talked from every time that she came to see me, she said, I was going home.

> We sat . . . and talked about the things that we [were] going to do when I got out.

> We talked about her family.   I mean we sat there and talked about my family, her kids, why her daughter . . . chose to stay in Rochester instead of moving with her to New Jersey.

> We talked about even how the fact that she had to have a hearing . . . before she could even take a bar exam.

> We talked about everything but . . . every time I tried to talk

4

> about the case, she would throw that off, like you don't have to
> worry about the case.   The case is good.   We don't have to worry
> about the case.

(*Id.* at 13-14).

Petitioner further asserted that even after the suppression motion failed because the judge elected not to make a decision in a "gray area" of the law, counsel continued to assert that they could win at trial by attacking the credibility of the Government's witnesses.   (*Id.* at 14-15). Petitioner claimed that counsel had continued to assure him that he would go home, never developed a back-up plan, and that counsel never advised him as to sentencing exposure or the effect Petitioner's considerable state criminal history would have on sentencing or his credibility at trial.   (*Id.* at 14-15).   Petitioner also claimed that counsel never showed him the written plea agreement, and only ever mentioned it the one time discussed above.   (*Id.* at 15).   Petitioner then testified that had counsel fully explained the plea, as his habeas counsel had done, he would have accepted the offered plea agreement.   (*Id.* at 16).   In the remainder of his direct examination testimony, Petitioner further claimed that his friendly or romantic relationship with counsel continued through trial and during his appeal process, suggesting that the hundreds of e-mails sent during the appeal process and counsel's placement of money into his prison account showed the nature of their relationship.   (*Id.* at 16-17).   On cross-examination, Petitioner admitted that he had lied under oath during the suppression hearing when he claimed that he had never been involved with the drug trafficking organization, and when he claimed that he had provided false information to the Government.   (*Id.* at 20-21).

Petitioner's trial counsel, Zilka Saunders, also testified at the evidentiary hearing.   Ms. Saunders testified that she graduated from law school in 2000, has been a member of the New

Jersey and New York Bars, and has never been disbarred. (*Id.* at 26). Ms. Saunders further stated that she is currently working for the Corporation Counsel of the City of Newark, and previously served as a Newark Municipal Judge for several months. (*Id.*). Ms. Saunders testified that, following working at several law firms doing insurance defense and criminal work, she worked for the Law Office of Paul W. Bergrin for approximately two years between either the end of 2006 through Spring 2008 or between early 2007 and early 2009. (*Id.* at 27). She further stated that, during her time with Bergrin's office, she handled mostly criminal cases, and had tried four criminal matters in the state courts before representing Petitioner. (*Id.*). Counsel also stated that she had worked on over one hundred criminal cases, and had done trial preparation in approximately fifty cases prior to becoming Petitioner's attorney. (*Id.*).

Ms. Saunders thereafter testified as to her understanding of the plea process in federal court, including the United States Sentencing Guidelines and how criminal history affects those guidelines, as well as the way in which cooperation agreements and resulting sentencing motions under Guidelines 5K1.1 work. (*Id.* at 28-29). She then testified that, in explaining agreements to a client, she would communicate the nature of the offer to the client, ensure that they had a "real understanding" of the terms of the agreement, and would explain to them sentencing exposure and discuss the evidence against them and the benefits of a guilty plea. (*Id.* at 29). Ms. Saunders testified that although she would recommend whether to take a plea or not to a client, it was ultimately the client's decision whether to accept or reject an offer. (*Id.*). She further stated that, where she would recommend not taking an agreement, she would explain the agreement and then tell the client why she thought it should be rejected based on the facts of the case. (*Id.* at 30). Ms. Saunders also stated that she would at times recommend both guilty pleas and cooperation

with the Government where the situation warranted.   (*Id.*).

   Counsel then testified as to how she became involved in Petitioner's case.   Ms. Saunders admitted that she and Petitioner had met at a club near the Bergrin office.   (*Id.* at 31).   She stated that they had a drink and talked about her potentially handling a post-conviction matter for Petitioner's son.   (*Id.*).   Although she admitted that there was some flirtation involved, Ms. Saunders stated that she never dated Petitioner, nor expressed an intention to do so, and only saw Petitioner twice at the club and did not otherwise see him socially, date him, or kiss him.   (*Id.*). Ms. Saunders further testified that she became involved in Petitioner's case after Petitioner's friend came to the Bergrin office looking for him, and asked her to find him, apparently with Bergrin's approval.   (*Id.* at 31-32).   She then stated that she learned he was in custody and went to see him at the jail, in the interests of finding out whether Petitioner wished to hire the Bergrin firm.   (*Id.* at 32).

   Ms. Saunders testified that, after she and the Bergrin firm were hired by Petitioner, she visited him frequently in jail to discuss his case and build the attorney-client relationship, and not out of some romantic interest.   (*Id.*).   She also stated that she did this to help build her reputation with others in the jail through word of mouth.   (*Id.*).   Ms. Saunders then stated that, although Petitioner initially told her he never made a statement to the Government, she ultimately learned of his statement and cooperation with the Government.   (*Id.* at 32-33).   Based on the information regarding Petitioner's cooperation she gleaned from both the Government and from confronting Petitioner, Ms. Saunders stated that she believed that the Government's case against Petitioner was "extremely strong."   (*Id.* at 34).   Based on the strength of the case, she further stated that she never told Petitioner she could guarantee success on a suppression motion, nor that his was a

winnable case.   (*Id.*).   Instead, she testified that she believed that he was "dead in the water" from the outset.   (*Id.*).

Based on her perspective on the case, Ms. Saunders testified that she did provide Petitioner with the details of the plea agreement that was offered by the Government and recommend that he take it.   (*Id.* at 35).   She further stated that she explained to him that the case against him was very strong, the differences between criminal trials in the federal and state systems and how pleas in the federal system were different and involved more judicial discretion at sentencing than those in the state courts.   (*Id.*).   Ms. Saunders testified that she also told him that, if he went to trial and lost, Petitioner, based on his criminal history, would likely face a sentence of thirty years to life, whereas the plea agreement contained a recommended range of 151 to 188 months.   (*Id.* at 34-35).   Based on the strength of the Government's case and the potential for a much more severe sentence following trial, Ms. Saunders concluded as follows:

> Even before I received the plea agreement, I had an opinion that [Petitioner's] was a case that . . . was to be pled.
>
> When I talked to [Petitioner] about pleading, this again was a conversation about the real numbers because you had a range. You had . . . no definitive [sentence], and he was used to pleading with [a definite sentence] like in the state system, and so he asked me . . . if he were to plead . . . what kind of sentence would the Judge likely give him.
>
> [Counsel then explained that she discussed the likely sentence Judge Cavanaugh would give under the plea with Paul Bergrin, who provided her with an estimate of seventeen years, which would include a slight upward departure from the plea based on Petitioner's criminal history and probationary status at the time of the crime.]
>
> I communicated to [Petitioner Bergrin's estimate of] 17 years. . . . [T]hat wasn't acceptable to [Petitioner].
>
> We talked about cooperation, potential cooperation,

8

particularly like a proffer, and he was not interested in cooperating
any further at all . . . or even getting involved in a proffer session.

> He communicated to me that he . . . was in fear because of
> the level of cooperation he had already provided, that when he got
> [a co-conspirator arrested, that co-conspirator] was not the head of
> the chain.   He was not the target.   He was not who [the
> Government] wanted.   The fact that he had cooperated to that level
> and now [the co-conspirator] was in custody, he had a fear of what
> he had done.

> [Counsel further explained that Petitioner feared for his safety
> because of rumors spread by the man who had implicated him with
> the Government, who had claimed that Petitioner had been the first
> one to cooperate with the Government].

> . . . . [Petitioner] didn't want to take the exposure of potentially
> getting 17 years.   He wouldn't take the plea for 17.   That was too
> big a number for him to plead to.   He would rather go to trial and
> roll the dice than to take 17 years.

(*Id.*at 36-37).

Ms. Saunders testified that she discussed the guidelines range in the plea agreement with Petitioner, and explained that Petitioner was already subject to a mandatory minimum sentence, and would likely face a lengthy sentence potentially up to the maximum sentence of life imprisonment if convicted after a trial.   (*Id.* at 37).   Given the serious sentence Petitioner faced, Ms. Saunders stated that she never told Petitioner the plea offer was outrageous or ridiculous, never gave the offer short shrift, and actually negotiated at length to keep the agreement open longer than initially offered so that she could attempt to convince Petitioner that a plea deal was in his best interests.   (*Id.*).   Ms. Saunders specifically testified that she initially recommended the plea, did not recommend choosing a suppression motion over the plea, and specifically told Petitioner that he was facing thirty to life without the deal in place.   (*Id.*).   Counsel further testified that she went to the jail "several times" and consistently recommended that Petitioner take the plea deal, even

taking the Guidelines manual to the jail to show Petitioner the difference in sentences between the range offered in the deal and that which would apply if he were convicted at trial. (*Id.* at 38). Ms. Saunders also testified that she explained to Petitioner the career offender enhancement, and how it would contribute to a lengthy sentence if he lost at trial. (*Id.*). Ms. Saunders thus testified that she fully explained the plea deal and potential sentencing exposure to Petitioner, that Petitioner fully understood the deal and his exposure, and that Petitioner repeatedly rejected the deal over her recommendations. (*Id.* at 41-42).

Ms. Saunders further stated that she only focused on the motion to suppress after Petitioner had "already told [her] hands down that he wasn't . . . interested in the plea." (*Id.* at 39-40). She also testified that she did not tell Petitioner to recant his story, and that it was Petitioner himself who provided her the information used in the suppression motion, and that Petitioner's testimony during the suppression hearing matched what he told her – that the information in the Government's reports as to his statement was "trumped up." (*Id.* at 40). She further stated that she never told Petitioner to lie or give false testimony during that hearing. (*Id.*). Ms. Saunders ultimately testified that, although she told Petitioner that there was a chance that the suppression motion might succeed, she never guaranteed that success and specifically told Petitioner that he could well lose both the motion and at trial. (*Id.* at 40-41).

On cross examination, Ms. Saunders denied any improper or romantic relationship with Petitioner. (*Id.* at 46). She also stated that the money she had put in Petitioner's accounts was given to her by Petitioner's girlfriend who Petitioner had involved in his criminal case, and who wished to give the money anonymously so as not to arouse the suspicion of Petitioner's wife and family. (*Id.*). Thus, Ms. Saunders denied the relationship, denied that she recommended that

10

Petitioner reject the plea deal, and that affirmed that she explained the deal and Petitioner's exposure at length while repeatedly suggesting that Petitioner accept the plea deal, but that Petitioner ultimately had no interest in the deal.


## II.  DISCUSSION

### A.  Legal Standard

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging the validity of his or her sentence.   Section 2255 provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255.  Unless the moving party claims a jurisdictional defect or a constitutional violation, to be entitled to relief the moving party must show that an error of law or fact constitutes "a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure."  *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir. 1979) (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)), *cert. denied* 444 U.S. 865 (1979); *see also Morelli v. United States*, 285 F. Supp. 2d 454, 458-59 (D.N.J. 2003).

11

**B.  Analysis**

**1.  Credibility Determinations**

This Court makes the following findings as to the credibility of the two witnesses who testified during the evidentiary hearing in this matter.   After having observed Petitioner's manner and demeanor during testimony, as well as having heard his testimony and having considered Petitioner's prior testimony and statements, this Court finds that Petitioner's testimony that counsel did not fully discuss the offered plea agreement with him was not credible.   Although Petitioner was not completely incredible, Petitioner's testimony regarding his allegedly brief and conclusory discussion of the plea agreement and merits of his case with counsel does not reflect the actual nature of the plea agreement that was offered, and is directly contradicted by the more credible testimony of Ms. Saunders.   This Court thus finds not credible Petitioner's assertion that counsel assured him that his case would be won and that the suppression motion was guaranteed to end in Petitioner's favor.

On these issues – the discussion of the plea agreement and counsel's advice regarding the likelihood of success on the suppression motion and at trial – this Court finds far more credible the testimony of Ms. Saunders.   Specifically, this Court credits Ms. Saunders' testimony that she considered the Government's case against Petitioner very strong, that she initially believed that Petitioner was "dead in the water" based on his extensive cooperation with the Government in setting up one of his co-conspirators, and that she advised him to take the offered plea agreement during several meetings with Petitioner.   This Court also finds credible Ms. Saunders' testimony that she believed Petitioner should plead guilty from the outset; that she fully discussed the agreement with Petitioner including information as to sentencing exposure, the guidelines, and

12

Petitioner's criminal history; that she continued to attempt to persuade him to take the deal after he initially expressed that he did not wish to plead guilty; and that Petitioner clearly told her that he had no interest in accepting the plea deal.   Thus, as to the sole issue presented here – the advice counsel gave Petitioner regarding the offered plea agreement – this Court, having considered the testimony, manner, and demeanor of the two witnesses, finds that Ms. Saunders was credible on this issue, and Petitioner's claims regarding this issue were not credible.[1]

## 2.   Petitioner's Ineffective Assistance of Counsel Claim

Following this Court's granting in part of Petitioner's Rule 59(e) motion, only a single claim remains in this matter: Petitioner's assertion that his trial counsel was constitutionally ineffective because she improperly counseled him to reject a favorable guilty plea.   The standards applicable to such a claim are well established:

> In *Strickland v. Washington*, [466 U.S. 668] (1984), the Supreme Court established a two-part test to evaluate ineffective assistance of counsel claims.   The first part of the Strickland test requires "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."   [*Id.* at 687] (internal citations omitted).   The second part specifies that the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome." [*Id.* at 694].   We have reasoned that "there can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument."

---

[1] Because the issue of the nature of the relationship between Petitioner and Ms. Saunders is not squarely before this Court and because a determination as to the nature of that relationship is unnecessary to dispose of Petitioner's remaining claim, this Court need not, and will not, address that issue here save to say that even if this Court did credit Petitioner's testimony over that of counsel as to the nature of their relationship, it would not affect this Court's decision on the issue of the advice counsel gave regarding the plea.

> *United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999).
>
> The year after deciding Strickland, the Supreme Court slightly modified the prejudice prong of the Strickland test in connection with guilty pleas. *See Hill v. Lockhart*, [474 U.S. 52] (1985). "In order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." [*Id.* at 59] (internal quotations omitted). The Court has re-emphasized that "[d]efendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process." *Lafler v. Cooper*, --- U.S. ---, 132 S.Ct. 1376, 1384[] (2012).
>
> When addressing a guilty plea, counsel is required to give a defendant enough information " 'to make a reasonably informed decision whether to accept a plea offer.'" *Shotts v. Wetzel*, 724 F.3d 364, 376 (3d Cir. 2013) (quoting *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992)), *cert. denied*, --- U.S. ---, 134 S.Ct. 1340[] (2014). We have identified potential sentencing exposure as an important factor in the decisionmaking process, stating that "[k]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty." *Day*, 969 F.2d at 43. In order to provide this necessary advice, counsel is required "to know the Guidelines and the relevant Circuit precedent...." *United States v. Smack*, 347 F.3d 533, 538 (3d Cir. 2003).

*United States v. Bui*, 795 F.3d 363, 366-67 (3d Cir. 2015).

Even where a petitioner can show that counsel provided defective advice in counseling him to reject a guilty plea, he must still show prejudice by showing that "but for his counsel's advice, he would have accepted the plea and that [the] plea agreement would have result in a lesser sentence." *Rickard v. United States*, No. 10-4089, 2011 WL 3610413, at *8 (D.N.J. Aug. 16, 2011); *accord Lafler v. Cooper*, --- U.S. ---, ---, 132 S. Ct. 1376, 1384-85 (2012) (prejudice in this context requires a petition to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different . . . [which i]n the

context of pleas [requires] a [petitioner] show the outcome of the plea process would have been different with competent advice").   Petitioner must therefore show not only that he would have taken the plea, but also that the Government would not have withdrawn the offer, that the Court would have accepted the offer's terms, and that the ultimate sentence he would have received would be less severe than that received following trial to establish prejudice.   *Lafler*, 132 S. Ct. at 1385.

Having considered the testimony of the two witnesses, having found that Petitioner's assertion that counsel told him to reject the plea is not credible, and having found that Ms. Saunders was credible in her testimony that she fully explained the deal and comparative exposure to Petitioner and recommended that he take the plea offer, this Court must conclude that Ms. Saunders did not provide Petitioner with inadequate advice regarding the offered plea deal.   Ms. Saunders' credible testimony clearly indicates that she discussed with Petitioner the terms of the offered plea agreement, including the stipulated offense level and the relevant guideline range, offered Petitioner an estimate as the sentence he faced under the plea as a result, and explained to Petitioner that he was facing a potential sentence of thirty years to life if he chose to go to trial and ultimately lost.   It is also clear from her credible testimony that she explained to Petitioner the potential benefits of continued cooperation and the strength of the Government's case, and that counsel never promised Petitioner an acquittal or guaranteed the success of a suppression motion in the event that he did not plead guilty.   Counsel offered Petitioner competent advice and a full explanation of the exposure Petitioner faced and the likelihood of conviction at trial, and repeatedly attempted to convince Petitioner that taking the plea was in Petitioner's best interest.   As such, this Court must conclude that counsel was not constitutionally defective because she did not advise

15

Petitioner to reject the plea deal, and certainly did not do so without fully explaining the deal, Petitioner's exposure, and the way in which the federal plea negotiation and sentencing systems work.   Based on counsel's credible testimony, it is clear that Petitioner received sufficient information to make a reasonably informed decision whether to accept the offered plea deal, and chose to reject that deal out of his own fear of reprisal and belief that a sentence in or slightly above the offered range was not acceptable to him.   As counsel gave Petitioner sufficient information to make a reasonably informed decision as to the offered plea agreement, counsel's performance was not constitutionally deficient, and Petitioner has failed to establish the first prong of the *Strickland* test for ineffective assistance of counsel claims.   *Bui*, 795 F.3d at 366-67.   As such, Petitioner's sole remaining claim must be denied.[2]   *Id.*

## III.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c) the petitioner in a § 2255 proceeding may not appeal from the final order in that proceeding unless he makes "a substantial showing of the denial of a constitutional right."   "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).   Because Petitioner's sole remaining claim of ineffective assistance of counsel is clearly without merit in light of this Court's credibility

---

[2] Counsel's credible testimony also establishes that Petitioner had no interest in accepting the plea in any event, and thus it is also clear that Petitioner would not be able to show prejudice even if counsel had been deficient as he cannot show that he would have accepted the offered plea deal. *See Lafler*, 132 S. Ct. at 1385.

16

determinations following a hearing in this matter, Petitioner has failed to make a substantial showing that he was denied a constitutional right, and jurists of reason could not disagree with this Court's denial of his motion to vacate his sentence.   As such, Petitioner's claim does not deserve encouragement to proceed further, and a certificate of appealability shall therefore be denied.

**IV. CONCLUSION**

For the reasons stated above, Petitioner's sole remaining § 2255 claim is DENIED and Petitioner is DENIED a certificate of appealability.   An appropriate order follows.

_____
Hon. Jose L. Linares,
United States District Judge

17